## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| KIMBERLY ROLLINGS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.   3:22-cv-0125 |
| | ) | |
| UNIVERSITY OF NOTRE DAME | ) | |
| DU LAC, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Kimberly Rollings ("Rollings"), by and through her attorneys, files this Complaint and Demand for Jury Trial against Defendant University of Notre Dame Du Lac ("Notre Dame") alleging violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.*, and breach of the employment contract between Notre Dame and Rollings.

## I.      PARTIES, VENUE, AND JURISDICTION

1.      Rollings is a citizen of Indiana and resident of South Bend, Indiana.

2.      Defendant Notre Dame is a private non-profit university incorporated under the laws of Indiana with its principal place of business in Notre Dame, Indiana.

3.      Rollings was an "employee" of Notre Dame as defined in Title VII 42 U.S.C. § 2000e(f).

4.      Notre Dame was Rollings's "employer" as defined in Title VII, 42 U.S.C. § 2000e(b).

5.      This Court has personal jurisdiction over Plaintiff and Defendant and venue is proper in this Court.

6.      This Court has original subject matter jurisdiction over Rollings's claims arising under Title VII of the Civil Rights Act of 1964, as amended, pursuant to 42 U.S.C. § 2000e-2 and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Rollings's claims arising under state law pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in the United States District Court for the Northern District of Indiana pursuant to 28 U.S.C. § 1391(b) because the events forming the basis of Plaintiff's claims occurred in South Bend, Indiana, which is within the jurisdiction of this Court.

8.      Plaintiff has exhausted her administrative remedies by timely filing Charges of Discrimination against Notre Dame with the Equal Employment Opportunity Commission ("EEOC") on February 24, 2021 (Charge No. 470-2021-01480), and June 14, 2021 (Charge No. 470-2021-02606).

9.      On or about November 24, 2021, and December 9, 2021, the EEOC issued Notices of Right to Sue on the above referenced charges.

## II.      FACTUAL ALLEGATIONS

10.      Rollings hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth here.

11.      At all times relevant herein, Notre Dame employed Rollings as an Assistant Professor in the School of Architecture from July 2013 – June 2021, and a Concurrent Assistant Professor in the Department of Psychology from August 2016 – June 2021.

12.      Rollings and Notre Dame entered into various contracts governing the terms and conditions of employment: (1) a Letter of Appointment for a three-year term, dated May 1, 2013; (2) a Letter of Extended Appointment, extending the term of Rollings's initial appointment by one year, dated August 31, 2015; (3) a Letter of Reappointment, dated May 8, 2017. The Letter of

Appointment, Letter of Extended Appointment, and Letter of Reappointment (collectively referred to herein as the "Letters of Appointment") are attached to the Complaint as Exhibit 1.

13.     Each of the Letters of Appointment included the following paragraph, or substantially equivalent language:

> Your appointment to the faculty at Notre Dame is subject to the University of Notre Dame *Academic Articles*, including future amendments thereto. In addition, you agree to abide by the rules, regulations, and policies of the University (as issued occasionally by departments, colleges, the provost or human resources, and including the rules, regulations, and policies set forth in the Faculty Handbook) and, by personal conduct, to promote the principles and ideals for which the University stands. This appointment letter, together with the University's *Academic Articles,* constitutes the entire contract of employment with the University of Notre Dame.

14.     Article IV, Section 2 of the Academic Articles of the University of Notre Dame, effective July 1, 2019 ("Academic Articles"), identifies principles of academic freedom, including "freedom to teach and to learn according to one's obligation, vision, and training; freedom to publish the results of one's study or research; and freedom to speak and write on public issues as a citizen." The Academic Articles are attached to the Complaint as Exhibit 2.

15.     Notre Dame protects the freedom of faculty members to contest tenure denials through the appeals process. Incorporated into Notre Dame's Faculty Handbook is a "Non-Retaliation Policy." The policy includes within the definition of retaliation "when a person experiences an adverse action because he or she . . . participated in a University investigatory, grievance, or appeals procedure."

16.     The University maintains detailed policies and procedures aimed at guiding faculty throughout their probationary period and evaluating faculty scholarship using objective processes and criteria. Included among those policies are the Academic Articles and the School of Architecture's policy document on "Standards and Procedures on Appointment - Reappointment

- Tenure and Promotion of Tenure-Track Faculty – Promotion of Tenured Faculty – Special Professional Faculty," effective September 6, 2017 ("SOA Standards").

17.    The SOA Standards provide for an annual evaluation process for a detailed, evidence-based review of the faculty member's work and the provision of feedback. Along the same lines, the SOA's Faculty Handbook provides, "Feedback will be given to every tenure-track faculty member as part of his/her trajectory towards tenure." SOA Faculty Handbook § 12(a)(ii). Similarly, University's Reappointment, Promotion and Tenure Guide ("RPT"), incorporated into the Academic Articles, provides, "Faculty members in their probationary period must receive substantive written annual reviews. After a successful renewal of an untenured faculty member's contract, the dean will provide written feedback to the faculty member conveying guidance from the PAC." RPT § C(7).

18.    According to the SOA Standards, the "impact" of scholarly work is demonstrated through peer-reviewed publications, juried presentations, and evidence of its reception in the appropriate field. SOA Standards § A(1). Impact is measured by the reputation of the publication venues in the relevant academic community, the quantity of publications, and the quality of scholarship, taking into account the comments of external peer reviewers. *Id*.

19.    In May 2020, Notre Dame denied Rollings's application for tenured faculty status, and informed her that her faculty appointment would terminate at the conclusion of the spring 2021 semester. After Rollings appealed, alleging procedural error, personal bias, and sex discrimination, Notre Dame initially remanded her application for reconsideration due to "procedural error," but ultimately upheld her tenure denial in May 2021. Notre Dame terminated Rollings's employment on or about June 30, 2021.

20.     Throughout her employment at Notre Dame, the School of Architecture provided Rollings fewer opportunities than her male colleagues to demonstrate that she met the requirements for tenure, which caused the denial of tenure. Notre Dame also subjected Rollings to a hostile work environment based on gender. Notre Dame also retaliated against Rollings for her internal and external complaints of gender discrimination and/or hostile work environment by denying her tenure. Notre Dame also breached its contractual obligations to Rollings, including her right to academic freedom.

21.     Rollings received her Ph.D. from Cornell University. Her work and degree are based in environmental psychology and architecture, with a focus on the relationship between the built environment and mental and physical health.

22.     Rollings received less support for her teaching, research, and service than male School of Architecture faculty. She was also not given critical support for the performance of empirical research that she was promised upon her hiring. She was ultimately not evaluated according to the SOA Standards in her application for tenure.

23.     When Rollings interviewed with School of Architecture Dean Michael Lykoudis, Dean Lykoudis asked her why she was seeking a job there, "despite the obvious?" The "obvious" was a reference to Notre Dame's hiring of Rollings's husband.

24.     When Notre Dame hired Rollings, Dean Lykoudis verbally promised Rollings that: (a) she would be given a teaching reduction from the typical load to focus on research; (b) she would develop all new courses; (c) that teaching studios was optional; (d) she could contribute to development of a new undergraduate research concentration and a new Ph.D. program; and (e) that the School of Architecture standards of evaluation for tenure were being revised to accommodate her type of work and would be completed during her first year.

25.     On or about May 24, 2013, in an email, Dean Lykoudis told Rollings that the School of Architecture aspired to "have a structure for matching funds, lab space allotment, TA/RA assignments and possibly start-up costs developed in a 3-5 year time frame (this is an estimate)."

26.     In the same May 24, 2013 email, Dean Lykoudis promised Rollings that the School of Architecture would provide her with: (a) up to $10,000 in matching funds for internal or external grant money; (b) 400 square feet of lab space; (c) assignment of a graduate student and TA/RAs, depending on course teaching requirements and availability; and (d) a reduced teaching load, "limited to one studio class and one seminar/lecture class per academic year unless you agree to additional courses."

27.     Dean Lykoudis' May 24, 2013 email to Rollings concluded, "At the moment you will need to put some faith that we will develop this program as we have outlined it and that you will be able to flourish at Notre Dame. I am confident that if we work together on this that we will accomplish our goals."

28.     Notre Dame failed to fulfill several of its promises to Rollings. Notre Dame permitted Rollings to teach one new course, required her to teach a studio, never initiated an undergraduate research concentration, and never initiated a Ph.D. program. Notre Dame did not implement a structure for matching funds, lab space allotment, TA/RA assignments, and start-up costs.

29.     Notre Dame delayed or failed to provide matching funds, updated promotion standards, and graduate research support that were promised to Rollings by Dean Lykoudis at hiring.

30.     Notre Dame provided Rollings with a lab space after her first academic year of employment that was smaller than promised.

31.     The School of Architecture repeatedly delayed or failed to provide basic IT support to Rollings throughout her employment, significantly affecting her teaching and research.

32.     Rollings received shorter and fewer releases from teaching to focus on research than similarly-situated male faculty members in the School of Architecture did. For example, one Assistant Professor received four consecutive semesters of teaching release and/or course reduction from 2018-2020 to focus on his research just prior to applying for tenure. The School of Architecture granted Rollings only one semester of teaching release two years prior to her application for tenure. In August 2019, Dean Lykoudis told Rollings that she would be required to pay 100% of her salary – rather than a smaller percentage expected of other Notre Dame faculty – for teaching releases for additional semesters, literally valuing her research and primary job responsibility at zero dollars, then later denied her tenure application for that unvalued research.

33.     The School of Architecture created formal research support policies after Rollings's tenure denial, in preparation for consideration of upcoming reappointment and tenure applications for three male faculty members. That support included a policy allowing Architecture faculty to pay for teaching releases at a rate comparable to other Notre Dame faculty.

34.     The School of Architecture enforced course budget deadlines against Rollings more stringently than male faculty, did not promote her courses as much as those taught by male faculty, and disrupted her classroom teaching more often than it disrupted classes taught by male faculty. Disparate support for teaching required Rollings to spend more time on teaching and less time on research than male colleagues.

35.     Dean Lykoudis allowed male faculty to report and share their service work during faculty meetings, but not Rollings.

36.     Rollings did not receive as many informal mentorship opportunities as her male colleagues. The mentorship Rollings did receive overemphasized teaching as compared to her male colleagues.

37.     Rollings also received inconsistent and conflicting feedback. For example, there were discrepancies between in-person feedback in annual review meetings and the written letters resulting from those meetings from Dean Lykoudis. Rollings was told to publish in certain publications, but later told those same publications were not of high enough quality. Rollings was told to focus on studio reviews and to keep doing what she was doing regarding teaching and research, but was later denied tenure because of her research. Rollings's annual reviews were also not "evidence-based," as required by the SOA Standards.

38.     As a result of the unequal support in teaching, research, service, and mentorship, Rollings had to expend more time and resources attempting to secure additional support than male faculty, which took time away from the performance of her regular work duties.

39.     The School of Architecture promoted and supported male faculty work more than Rollings's work. For example, the School of Architecture initially refused to list Rollings's areas of expertise on the School of Architecture website as it did for male faculty, promoted male faculty work more than female faculty work during faculty meetings, and denigrated Rollings's contributions to faculty meetings.

40.     Rollings received less office staff support than her male colleagues, including less timely research support, and less staff support for planning symposia.

41.     The School of Architecture's operations disparately and negatively impacted female faculty more than male faculty, creating unequal paths for male and female faculty

members to seek tenure. Rollings and two former female colleagues had to collaborate with other departments to obtain necessary resources, including mentorship and administrative support.

42.     Despite these limitations, Dr. Rollings met the quantitative threshold for tenure and promotion and published peer-reviewed articles in well-regarded journals in her field, outperforming her male colleagues, most of whose publications were not subjected to rigorous peer review.

43.     In 2017, the School of Architecture hired a male faculty member to the rank of Associate Professor without tenure, a higher rank than Rollings despite her superior scholarship record and identical degree type (Ph.D.) obtained the same year. When Rollings requested promotion to the same rank after receiving a competitive offer from another university, Dean Lykoudis refused.

44.     Although not part of formal written requirements for tenure, promotion, or otherwise, School of Architecture professors are expected and encouraged to participate in studio reviews where students present design projects to a panel of faculty and professionals.

45.     In April 2015, Rollings – while on medical leave and not required to attend reviews – agreed to attend a studio review at the invitation of another professor on the tenure committee. The panel consisted of Rollings, three male School of Architecture professors including two on the tenure committee, and another tenured male professor from another university.

46.     Throughout the presentations, the outside professor made lewd, sexually explicit comments to students about stereotypical college life. During the second presentation, two male School of Architecture professors consumed all of the time without allowing Rollings an opportunity to speak. The outside professor said, "You have to just speak, we're men, we're not going to let you." After the next set of presentations, one of the male School of Architecture

professors commanded Rollings to "speak, speak!" None of the male School of Architecture professors addressed the outside professor's inappropriate comments.

47.     The April 2015 studio review impacted the School of Architecture's evaluation and perception of Rollings that year and every year after, including her tenure review. Dean Lykoudis labeled Rollings as "quiet" after discussing that review only with the male faculty present.

48.     Rollings discussed the 2015 review with Associate Dean Dennis Doordan, a member of the tenure committee and Rollings's assigned faculty mentor. He instructed Rollings not to report the April 2015 studio review incident to the Office of Institutional Equity (OIE) because he had "seen that affect tenure cases." He also told her that she did not have to participate in studio reviews with those male faculty present. Rollings declined all future invitations from those reviewers.

49.     In 2016, Dean Lykoudis encouraged Rollings to attend more studio reviews because she had declined invitations from one faculty member present at the 2015 incident. Dean Lykoudis did not review her participation in other reviews or consult any other faculty then or any time in the future including during tenure evaluation, and did not acknowledge the mistreatment she experienced or make efforts to redress it.

50.     Throughout her employment at Notre Dame, Rollings was subjected to numerous instances of harassing conduct based on her gender. These include, but are not limited to, the following: unwanted touching (including kissing her hand and rubbing her shoulders), being told, "you women are always late" by a male Assistant Dean, being told not to stand up for herself because she is a woman by an Associate Dean and other faculty, being told she needed to "differentiate" herself from other young female faculty members, being directed to vacate

classroom space early in order to accommodate male faculty, and being referred to by her first name in front of students while male faculty are referred to by title and last name.

51.     Notre Dame was aware of gender-based disparate treatment and gender-based harassment in the School of Architecture. During Rollings' employment, at least two Notre Dame faculty climate surveys indicated large disparities between genders in the School of Architecture. Other faculty also complained to the Office of Institutional Equity and Provost's Office. Upon information and belief, Notre Dame has not exercised reasonable care to prevent or promptly correct these issues.

52.     In May 2019, Rollings received a job offer from Cornell University for a tenure-track position as an Associate Professor. The offer included a higher salary, title and more research support. Rollings notified Dean Lykoudis of the offer and asked whether Notre Dame would negotiate a retention offer. Dean Lykoudis offered a pay increase and to grant Rollings five years of graduate research assistant support from the College of Engineering for a Department of Psychology graduate student (contingent upon Rollings receiving tenure). At no time did Dean Lykoudis indicate that Rollings would have a problem with her tenure case or that she should accept the offer from Cornell. Rollings reasonably believed that the School of Architecture's and Notre Dame's efforts to retain her in response to the Cornell offer indicated that Dean Lykoudis and the School of Architecture did not have significant concerns about the impact and quality of her scholarship and the promise of her research trajectory.

53.     In the spring of 2018, Rollings inquired about applying for tenure early with the support of Associate Dean Krupali Krusche. Dean Lykoudis told Rollings to "keep doing what [she was] doing for another year." Dean Lykoudis did not identify any concerns he had with

Rollings's tenure case, nor make any suggestions for how she could do anything differently to improve her case.

54.     In July 2019, Rollings applied for promotion to the rank of Associate Professor with tenure.

55.     On February 7, 2020, Rollings met with Dean Lykoudis and reported numerous examples of how she had been treated worse than male faculty throughout her employment due to her gender, and her experiences of sex-based harassment. Upon information and belief, Dean Lykoudis took little to no steps to investigate, prevent or promptly correct the disparate treatment or harassment.

56.     On May 4, 2020, Dean Lykoudis verbally informed Rollings that Notre Dame had denied her tenure application. On May 5, 2020, Rollings received a letter from Notre Dame Provost Thomas Burish formally denying her tenure application. Notre Dame notified Rollings that she would receive a "terminal year appointment" and her faculty appointment would end at the conclusion of the spring semester of 2021.

57.     Rollings appealed her tenure denial on two separate grounds through two internal appeal processes. First, on July 2, 2020, Rollings submitted an appeal alleging procedural errors and personal bias. On October 2, 2020, Rollings submitted an appeal based on sex discrimination.

58.     On October 29, 2020, Rollings received a letter from Notre Dame President Rev. John I. Jenkins in response to Rollings's first appeal. The letter stated that he had "concluded that the evidence of procedural error supports [her] appeal," and remanded Rollings's tenure case for reconsideration.

59.     On April 2, 2021, Notre Dame denied Rollings's sex discrimination appeal. Notre Dame's investigation of Rollings's sex discrimination appeal lacked due process and was narrow

in scope. The investigator did not interview many witnesses and excluded one Rollings specifically requested. According to the investigator, she limited her investigation to comparison cases and what affected the tenure review process and decision directly rather than what "may have" affected the tenure decision. The investigator did not investigate whether Rollings had equal opportunity to demonstrate the standards expected for tenure during her employment at Notre Dame according to internal procedures outlined in the Academic Articles.

60.     On April 5, 2021, the new School of Architecture Dean, Stephanos Polyzoides, requested to meet with Rollings for the first time regarding the remand of her tenure case. Rollings only had a few days' notice to prepare for the meeting and was not given instructions on what would be expected of her at the meeting.

61.     On April 9, 2021, Rollings met with Dean Polyzoides virtually. Dean Polyzoides asked Rollings no questions about the merits or impact of her work, only the "emotion of it all." He asked if she was hired by "concealing [her] direction, entire background, and qualifications." Dean Polyzoides described Rollings's work as "unconventional," despite the content being the reason why Dean Lykoudis hired her. He said, "[it is] very hard to imagine how you could land in a School in which you think you could set up a lab and do research, then end up teaching sophomore studio – there's something completely bizarre about this." He also said, "I can't think of anybody who teaches studio by themselves, who organizes primary research around that studio, and goes from there. I don't know who said this was ok." Yet that is what Dean Lykoudis had instructed and required Rollings to do for tenure.

62.     Dean Polyzoides said that the tenure decision was "not just about [Rollings's] tenure case, but the future of the School." This comment suggested that reasons outside of the School of Architecture promotion standards would inform the decision. Dean Polyzoides said that

he would have additional meetings with Rollings, but those meetings never occurred. He also said, "in the end I have no doubt that institutions always win."

63.     On May 17, 2021, Dean Polyzoides informed Rollings that she had been denied tenure again. On May 20, 2021, Rollings received a letter from Provost Marie Lynn Miranda denying tenure. On May 22, 2021, Dean Polyzoides emailed Rollings the reasons for tenure denial, stating that Rollings was "not granted tenure because there was insufficient evidence that your scholarship has moved your particular research field forward, or that your work has had an impact in shaping the discipline and practice of Architecture."

64.     In determining that there was insufficient evidence of the impact of Rollings' scholarship, the University disregarded the appropriate field-specific criteria, and procedures set forth in the SOA Standards and as established by experts in her field, as well as the assessments of experts in her field. The University also falsely concluded that Rollings did not publish in top journals in her field and ignored evidence of the strong significance and impact of Rollings's work in architecture and her sub-specialty area.

65.     The reasons for the second tenure denial were different from the reasons given for the first tenure denial.

66.     Dean Polyzoides had no personal or independent knowledge of Rollings's work. According to Dean Polyzoides, he discussed Rollings's case with the prior Dean, Dean Lykoudis, and other faculty.

67.     Upon information and belief, Notre Dame attempted to fix one or more of the "procedural errors" from Rollings's first tenure denial by having the new Dean write a new letter to the Provost Advisory Committee.

68.    Upon information and belief, Dean Polyzoides' reasoning for the tenure denial were strongly influenced by Dean Lykoudis' input.

69.    Upon information and belief, Dean Polyzoides did not follow the standards and criteria for evaluating tenure as described in the Academic Articles and School of Architecture's standards and procedures.

70.    Upon information and belief, the decision(s) of the Provost(s) and President to deny tenure were substantially caused by the recommendations of the School of Architecture Dean(s).

71.    Notre Dame did not offer Rollings a non-tenure track position when it denied her tenure application. The School of Architecture has offered male professors non-tenure track positions when their tenure applications were denied.

72.    Rollings's contract with Notre Dame expired on or about June 30, 2021, ending her employment with Notre Dame.

### III.    LEGAL ALLEGATIONS

### Count I : Sex Discrimination, in violation  of Title VII

73.    Plaintiff re-alleges all other paragraphs as if fully set forth herein.

74.    Rollings is female and a member of a protected class.

75.    Notre Dame knew that Rollings was female.

76.    Rollings met or exceeded Notre Dame's legitimate performance expectations at all times during her employment.

77.    Rollings suffered adverse employment action(s) when Notre Dame: (a) denied her tenure initially on or about May 5, 2020; (b) denied her tenure on remand and reconsideration on or about May 20, 2021; and (c) declined to renew her faculty appointment beyond June 30, 2021.

78.    Notre Dame treated Rollings differently, to her detriment, in the provision of

research resources and tenure evaluation as compared to similarly situated male employees.

79.     There is a substantial causal connection between Rollings's sex and Notre Dame's adverse employment actions.

80.     Rollings has suffered damages as a result of Notre Dame's gender discrimination, including but not limited to back pay, front pay, lost benefits, out of pocket expenses, loss of career opportunity, loss of future earning capacity, employer-provided benefits, and emotional distress damages.

**Count II: Retaliation, Title VII**

81.     Plaintiff re-alleges all other paragraphs as if fully set forth herein.

82.     Rollings engaged in protected activity by reporting sex discrimination and hostile work environment based on sex internally at various times to various people, including to her direct supervisor, Dean Lykoudis, on or about February 7, 2020.

83.     Rollings engaged in protected activity by alleging sex discrimination through her internal appeal of her initial tenure denial on or about October 2, 2020.

84.     Rollings engaged in protected activity by filing a Charge of Discrimination, alleging gender discrimination, hostile work environment, and retaliation, with the Equal Employment Opportunity Commission, on or about February 24, 2021.

85.     Notre Dame knew about all of Rollings's protected activities at or near the time they occurred.

86.     Rollings suffered adverse employment action(s) when Notre Dame: (a) denied her tenure initially on or about May 5, 2020; (b) denied her tenure on remand and reconsideration on or about May 20, 2021; and (c) declined to renew or extend her faculty appointment beyond June 30, 2021.

87.     Notre Dame would not have denied Rollings tenure and/or terminated her employment but for her internal complaints and/or EEOC Charges of Discrimination, alleging gender discrimination, hostile work environment, and retaliation.

88.     Rollings has suffered damages as a result of Notre Dame's retaliation, including but not limited to back pay, front pay, lost benefits, out of pocket expenses, loss of career opportunity, loss of future earning capacity, employer provided benefits, and emotional distress damages.

## Count III: Hostile Work Environment, Title VII

89.     Plaintiff re-alleges all other paragraphs as if fully set forth herein.

90.     Throughout her employment as Assistant Professor in the Notre Dame School of Architecture, Rollings was subject to a hostile work environment based on gender.

91.     Rollings's work environment was objectively and subjectively hostile based on gender.

92.     Notre Dame knew or should have known, via faculty climate surveys, Office of Institutional Equity complaints from other faculty members, staff complaints, Rollings's complaint to Dean Lykoudis, Rollings' internal tenure denial appeal, and Rollings' EEOC Charge, about the hostile work environment experienced by Rollings and other female School of Architecture faculty and staff.

93.     Notre Dame failed to take any reasonable steps or corrective actions to prevent the harassment and hostile work environment from recurring.

94.     Rollings has suffered damages as a result of the hostile work environment she experienced, including but not limited to back pay, front pay, lost benefits, out of pocket expenses, loss of career opportunity, loss of future earning capacity, employer provided benefits, and emotional distress damages.

### Count IV: Breach of Contract

95.     Plaintiff re-alleges all other paragraphs as if fully set forth herein.

96.     At all relevant times herein, a valid and enforceable contract existed between Rollings and Notre Dame, which consisted of her Letters of Appointment and several policy documents incorporated by reference within the Letters of Appointment, including the Academic Articles, the RPT, the Faculty Handbook, the SOA Standards, and policies issued by the School of Architecture.

97.     Notre Dame breached its contractual obligations to Rollings in the following ways when evaluating her application for promotion and tenure:

     a.   By failing to provide her the research resources she was promised as part of her initial employment contract;

     b.   By inserting factors into the tenure process that impinge upon academic freedom in violation of section IV(2) and IV(7)(a)(1) of the Academic Articles, such as hostility towards empirical approaches to research within the field of architecture;

     c.   By applying criteria that were not discipline-specific in violation of section IV(6) of the Academic Articles, the Reappointment, Promotion and Tenure Guide (RPT), and section A(1) of the SOA Standards;

     d.   By failing to advise Rollings of the applicable standards and criteria and provide consistent feedback pursuant to the University's annual review process;

     e.   By failing to perform a good-faith evaluation of the impact of Rollings's work using the criteria and methods of assessment set forth in the SOA Standards; and

     f.   By retaliating against Rollings for her appeal of her May of 2020 tenure denial and filing a Charge of Discrimination with the EEOC.

98.     In addition to basing its tenure decision on factors that impinge on Rollings's academic freedom, Notre Dame limited Rollings's academic freedom by failing to provide her with the resources and support that she requested, was promised, and needed to teach and research according to her obligation, vision and training.

99.     Notre Dame penalized Rollings for her exercise of academic freedom by demonstrating resistance to her area of specialization, delaying revision of SOA Standards to address her work as promised at hiring, and treating or characterizing her role and responsibilities as unconventional or unusual.

100.    These breaches of the employment contract between Rollings and Notre Dame were substantial factors in her tenure denial.

101.    To the extent that Notre Dame's policy documents are ambiguous about the extent to which higher-level administrators can make subjective judgments about the impact of scholars' work, and the extent to which they must defer to a candidate's internal and external peers, Notre Dame ignored or dismissed the overwhelming weight of objective indicia of the impact and significance of professors' scholarship. Notre Dame did not assess the impact of Rollings's scholarship in good faith.

102.    Rollings has suffered lost salary, benefits, and out of pocket expenses, lost career opportunity, and lost future earning capacity, as a result of Notre Dame's breaches of her contractual rights.

## IV. RELIEF REQUESTED

Rollings requests the following relief:

      a.    All wages and other economic benefits lost as a result of Defendant's unlawful actions, including, but not limited to, back pay, front pay, lost

employer provided benefits, out of pocket expenses, loss of career opportunity, and loss of future earning capacity;

b.  Compensatory damages;

c.  Liquidated damages;

d.  Punitive damages;

e.  Damages for emotional distress, mental anguish, and pain and suffering;

f.  All costs and reasonable attorney fees incurred in litigating this action;

g.  Pre-judgment and post-judgment interest; and

h.  Any and all other legal and/or equitable relief to which Rollings is entitled.


Respectfully submitted,


*/s/ Christopher S. Stake*_____
Kathleen A. DeLaney (#18604-49)
Christopher S. Stake (#27356-53)
*Attorneys for Plaintiff Kimberly Rollings*

DeLaney & DeLaney LLC
3646 N. Washington Blvd.
Indianapolis, IN  46205
Tel. 317.920.0400
Fax  317.920.0404
Kathleen@delaneylaw.net
cstake@delaneylaw.net

## **JURY DEMAND**

Plaintiff, Kimberly Rollings, hereby requests a trial by jury in the above-captioned matter.

Respectfully submitted,


*/s/ Christopher S. Stake*_____
Kathleen A. DeLaney (#18604-49)
Christopher S. Stake (#27356-53)
*Attorneys for Plaintiff Kimberly Rollings*

21